**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------- x

    **HYPNOTIC HATS, LTD.,**

                      **Plaintiff,**

        **-against-**

    **WINTERMANTEL ENTERPRISES, LLC, Hype**
    **SOCKS, LLC, AND HYPE CHEER, LLC.,**

             **Defendants.**

             **1:15-CV-06478 (ALC)**
             <u>**OPINION AND ORDER**</u>

----------------------------------------------------- x

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Hypnotic Hats, Ltd. ("Hyp"), a corporation that sells socks and athletic bras in connection with its HYP trademark, is engaged in a trademark dispute with Wintermantel Enterprises, LLC ("Wintermantel Enter."), Hype Socks, LLC ("Hype Socks"), and Hype Cheer, LLC ("Hype Cheer") (together, "Defendants"), companies that have sold socks and athletic bras bearing the HYPE SOCKS and HYPE CHEER marks. Plaintiff contends that the HYPE marks infringe on its HYP trademark, while Defendants claim that the marks are not confusingly similar and that, in any event, Plaintiff's trademark is invalid. Plaintiff seeks summary judgment on its federal trademark infringement claim. Defendants oppose and also seek summary judgment on Plaintiff's federal trademark, federal unfair competition and false designation of origin, and common law unfair competition claims. Additionally, Defendants move to exclude Plaintiff's expert report. Finally, both parties have moved to file certain documents under seal.

1

For the reasons that follow, Plaintiff's motion for summary judgment is DENIED, Defendants' motions for summary judgment are GRANTED, and Defendants' motion to exclude Plaintiff's expert report is DENIED. Both parties' requests to file under seal are GRANTED in part and DENIED in part.

## BACKGROUND

### I. Factual Background

The following facts are taken from the parties' Rule 56.1 Statements of Material Facts ("SMF"). Unless otherwise noted, the facts are undisputed.

Plaintiff has used the "HYP" mark in connection with its marketing and sale of products, including socks, since approximately 2002. Plaintiff's Statement of Material Facts ("SMF") ¶ 3 (ECF No. 75). In 2005, the U.S. Patent and Trademark Office ("PTO") granted Plaintiff a federal trademark for "HYP" in connection with clothing. *Id.* ¶ 1. Hyp primarily sells its socks off the shelf through retail stores and e-commerce channels. Defendants' SMF ¶¶ 50-52 (ECF No. 72-1).[1] The parties dispute the extent to which Plaintiff also sells its socks through other channels of trade, including to sports teams. *Id.*; Plaintiff's Response to SMF ("PRSMF") ¶¶ 50-52 (ECF No. 83).

Defendants have sold socks bearing the HYPE SOCKS mark since about 2014. SMF ¶¶ 8, 54.[2] Defendants primarily sell customized socks to coaches of sports teams that place specific orders with Defendants' salespeople. SMF ¶ 55. The parties contest the extent to which Defendants additionally sell their socks through other channels of trade, such as to marketing and

---

[1] For ease of reference, the parties' Statements of Material Facts are referenced jointly as "SMF."
[2] From 2014 until August 2015, Defendants sold its HYPE SOCKS under Wintermantel Enter. d/b/a Hype Socks. SMF ¶¶ 8, 18, 54; PRSMF ¶ 54. In August 2015, Defendants created Hype Socks, LLC ("Hype Socks"). SMF ¶ 16. Wintermantel Enter. owns 95% of Hype Socks. *Id.* ¶ 17. After its formation, Hype Socks took over selling socks with the HYPE SOCKS mark. *Id.* ¶ 19. During this time, Defendants underwent a rebranding. *Id.* ¶ 20.

promotional companies, brick and mortar stores, and traditional sports retailers. *Id.*; PRSMF ¶ 55. They further dispute whether Defendants have sold non-customized socks. PRSMF ¶ 55. In addition to its sock sales, in 2015 Defendants began using the HYPE CHEER mark in connection with athletic sports bras. SMF ¶ 91.[3]

Plaintiff first discovered Defendants' use of the HYPE SOCKS mark around August 2014. *Id.* ¶ 9. At that time, Hyp President Howard Levy received a phone call from his brother, a youth sports coach. His brother stated that he had received an email solicitation from Hype Socks and asked if Levy had sent the email. *Id.* ¶¶ 9-11. The email, in fact, came from Defendants. *Id.* ¶ 12.

On April 8, 2015, Plaintiff sent Defendants a cease and desist letter demanding that they stop using the HYPE SOCKS mark because it is confusingly similar to its HYP trademark. *Id.* ¶ 13; *see* Declaration of Ryan M. Gainor ("Gainor Decl") Ex. 6 (ECF No. 76-6). Defendants continue to use the mark in catalogs, mass email campaigns, and a website. SMF ¶¶ 21-22.

Plaintiff also notes that Defendants' promotional materials have contained images depicting other sports logos and trademarks without permission. *Id.* ¶¶ 37-49.

## II.    Procedural Background

Plaintiff filed the complaint commencing this action on August 17, 2015, alleging federal trademark infringement, federal unfair competition and false designation of origin, and common law unfair competition. ECF No. 1. On January 21, 2016, Plaintiff filed an amended complaint. ECF No. 23 ("FAC").

---

[3] The parties contest whether Defendants still use the HYPE CHEER mark. The HypeCheer.com domain name still exists and that site features "a performance bra." Deposition of Joshua Wintermantel, Hype Cheer ("Wintermantel Hype Cheer Dep") at 12:5-7 (ECF No. 72-5). However, the Hype Cheer LLC has "dissolved" and all products, including the performance bra, are sold under the name "Love Performance," not "Hype Cheer." *Id.* at 8:22-10:24; 89:9-17.

On February 23, 2018, Defendants moved for summary judgment on all counts. ECF No. 72 ("Def Mem"). Also that day, Plaintiff filed a motion for partial summary judgment on its federal trademark claim. ECF No. 74 ("Pl Mem"). The parties filed their opposition motions on March 9, 2018. ECF No. 81 ("Def Opp"); ECF No. 82 ("Pl Opp"). Both parties filed their reply briefs on March 16, 2018. ECF No. 86 ("Pl Reply"); ECF No. 87 ("Def Reply").

On February 26, 2018, Defendants filed a motion to seal portions of their summary judgment memoranda and supporting exhibits and deposition testimony. ECF No. 77 ("Def Seal Mot"). Plaintiff likewise filed a motion to seal on March 9, 2018. ECF No. 80 ("Pl Seal Mot"). On April 20, 2018, this Court denied the parties' motions without prejudice and granted them leave to file additional briefs articulating adequate justifications for sealing. ECF No. 94 ("Sealing Order"). Plaintiff accordingly filed a renewed motion on May 3, 2018. ECF No. 96 ("Pl Renewed Seal Mot"). Defendants did not renew their motion, but included justifications in Plaintiff's filing. *See id.* The relevant filings currently remain under seal.

On February 27, 2018, Defendants filed a motion to exclude the expert report of Melissa Pittaoulis, Ph.D., which had been submitted in connection with Plaintiff's partial summary judgment motion. ECF No. 78 ("Def Expert Mem"). Plaintiff responded in opposition on March 23, 2018. ECF No. 88 ("Pl Expert Opp"). Defendants filed their reply brief on March 30, 2018. ECF No. 90 ("Def Expert Reply").

Finally, on April 11, 2018, Plaintiff filed a motion to supplement the summary judgment record with an additional email. ECF No. 92. Defendants consented on April 24, 2018 and sought leave to include a comment about the email in the record. ECF No. 95. On April 30, 2018, this Court granted both parties' motions. ECF No. 97.

Accordingly, the Court considers the motions fully briefed

# DISCUSSION

## I.  Motions for Summary Judgment

### A. Standard of Review

Summary judgment is appropriate if there is "no genuine dispute as to any material fact."

Fed. R. Civ. P. Rule 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for

its motion, and identifying those portions of the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986) (internal quotation marks omitted).  Then, the burden shifts to the non-moving

party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477

U.S. at 250.  The party opposing summary judgment "may not rely on mere speculation or

conjecture" as "mere conclusory allegations or denials . . . cannot by themselves create a genuine

issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166

(2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

Pursuant to Local Rule 56.1, the movant must "submit a 'separate, short and concise

statement's setting forth material facts as to which there is no genuine issue to be tried." *Holtz v.

Rockefeller & Co., Inc.*, 258 F.3d 62, 72 (2d Cir. 2001) (quoting Local Rule 56.1(a)).  The

opponent "must respond with a statement of facts as to which a triable issue remains." *Id.* (citing

Local Rule 56.1(b)).  The facts set forth in the movant's statement "will be deemed to be

admitted unless controverted' by the opposing party's statement." *Id.* (quoting Local Rule

56.1(c)).  However, where "the record does not support the assertions in a Local Rule 56.1

statement, those assertions should be disregarded and the record reviewed independently." *Id.* at 74.

Factual disputes that are "irrelevant" or "unnecessary" are insufficient; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law" can defeat a motion for summary judgment. *Anderson*, 477 U.S. at 248. In making this determination, the Court must draw all inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When there are cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citation omitted).

## B. Analysis

### i. Federal Trademark Infringement

Courts reviewing federal trademark infringement claims apply a two-prong test, looking "first to whether the plaintiff's mark is entitled to protection, and second to whether the defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 102 (2d Cir. 2010) (citation and internal quotation marks omitted).

#### 1. Ownership of a Valid Trademark

Plaintiff asserts that it has a valid registered trademark. Defendants contend that Plaintiff's mark is fraudulent and thus not entitled to protection.

The Lanham Act "provides that a mark registered by its owner shall be *prima facie* evidence of the registrant's exclusive right to use the mark in commerce on the product."

*Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing and Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993). "As such, when a plaintiff sues for infringement of its registered mark, the defendant bears the burden of production and persuasion to rebut the presumption of ownership." *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 239 (S.D.N.Y. 2013) (citations omitted). Moreover, "[a] registered mark becomes incontestable if it has been in continuous use for five consecutive years subsequent to its registration and is still in use." *Gruner*, 991 F.2d at 1076 (citing 15 U.S.C. § 1065). An incontestable mark is "conclusive evidence . . . of the registrant's exclusive right to use the registered mark in commerce." *Id.* (citing 15 U.S.C. § 1115(b)).

Nevertheless, "there are still certain limited grounds available to challenge" incontestable marks, including fraud. *Calzaturificio Rangoni S.p.A. v. U.S. Shoe Corp.*, 868 F. Supp. 1414, 1420 (S.D.N.Y. 1994). "'Fraud in procuring a trademark registration . . . occurs when an applicant knowingly makes false, material representations of fact in connection with his application.'" *MPC Franchise, LLC v. Tarntino*, 826 F.3d 653, 658 (2d Cir. 2016) (quoting *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009)). The party claiming fraud "cannot merely show that the trademark holder 'should have known' that the application contained false statements of material fact." *Id.* at 659 (citing *Bose*, 580 F.3d at 1244). Rather, the movant must demonstrate that the trademark holder made "knowing misstatement[s] of material fact that indicate a deliberate attempt to mislead the [PTO]." *Id.* at 660 (citation omitted).

"Alleged fraud must be demonstrated by 'clear and convincing evidence.'" *Martal Cosmetics, Ltd. v. Intern. Beauty Exchange Inc.*, No. 01-cv-7595, 2010 WL 2179022, at *2 (E.D.N.Y. May 28, 2010) (quoting *Orient Exp. Trading Co., Ltd. v. Federated Dept. Stores, Inc.*, 842 F.2d 650, 653 (2d Cir. 1988)). This is a "heavy burden" that "requires the opposing party to

present proof that leaves nothing to speculation, conjecture, or surmise. Should there be any doubt, it must be resolved against the party making the claim." *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 440 F. Supp. 2d 249, 267 (S.D.N.Y. 2006) (internal quotation marks and citation omitted). Indeed, the Court must allow "'considerable room for honest mistake, inadvertence, erroneous conception of rights, and negligent omission.'" *Haggar Intern. Corp. v. United Co. for Food Indus. Corp.*, 906 F. Supp. 2d 96, 127 (E.D.N.Y. 2012) (quoting *Yocum v. Covington*, 216 U.S.P.Q. 210, 216 (T.T.A.B. 1982)).

Here, since Plaintiff holds a registered trademark it presumably owns the HYP mark. *See C=Holdings*, 992 F. Supp. 2d at 239. Further, Plaintiff testified that it has used the HYP mark in connection with the promotion and sale of socks for five consecutive years subsequent to its registration, and that it continues to use the mark. SMF ¶ 3. While Defendants state that they lack "personal knowledge" of this fact and thus cannot admit or deny it, they have not produced any evidence refuting this claim. This is insufficient to create a genuine issue of fact. *See Hicks*, 593 F.3d at 166. Accordingly, the Court considers the trademark incontestable.

Even so, the Court must still assess Defendants' fraud allegations.[4] The PTO warns that "the lack of use on **all** goods/services for which you claim use, could jeopardize the validity of the registration and result in its cancellation." SMF ¶ 123. Defendants argue that Plaintiff's mark is fraudulent because Plaintiff's trademark lists the date of first use for all covered goods as March 15, 1991, yet Plaintiff did not begin selling socks in association with the HYP mark until approximately 2002. *Id.* ¶¶ 120-121. Defendants also point to Plaintiff's registration renewal in

---

[4] Since Defendants did not bring a counter-claim for fraud, the Court only addresses these allegations insofar as they question the HYP trademark's validity.

January 2015, which lists goods that it has not sold under the HYP mark since the late 1990's. *Id.* ¶¶ 127, 129, 130.

Unlike cases on which Defendants rely, here Defendants adduce no evidence that Plaintiff knowingly made false material misstatements on these trademark applications. *Cf. Mister Leonard Inc. v. Jacques Leonard Couture, Inc.*, 23 U.S.P.Q. 1064, 1992 WL 147884, at *2-3 (T.T.A.B. 1992) (senior official gave multiple sworn statements that company did not sell men's swimwear under the mark yet signed a trademark declaration stating that the company sold men's swimwear). Without adducing "evidence to support an inference of deceptive intent," Defendants have simply "failed to satisfy the clear and convincing evidence standard required to establish a fraud claim." *In re Bose*, 580 F.3d at 1246.

Accordingly, Plaintiff has satisfied the first element of its trademark infringement claim.

### 2. Likelihood of Confusion

The "crucial issue in an action for trademark infringement . . . is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Savin Corp. v. Savin Group*, 391 F.3d 439, 456 (2d Cir. 2004) (citations and internal quotation marks omitted). In this analysis, courts look to the "*Polaroid* factors":

> (1) the strength of the senior mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will 'bridge the gap'; (5) actual confusion; (6) the defendant's good faith (or bad faith) in adopting its own mark; (7) the quality of defendant's product; and (8) the sophistication of the buyers.

*Id.* (citing *Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)).

"The application of the *Polaroid* test is 'not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be

confused.'" *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009)

(quoting *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 384 (2d Cir. 2005)).

Furthermore, "depending on the complexity of the issues, 'the court may have to take still other

variables into account.'" *Savin*, 391 F.3d at 456 (citing *Polaroid*, 287 F.2d at 495).

### *Socks*

The Court first assesses the likelihood of confusion as to socks.

#### a. **Strength of Mark**

This factor "measures a mark's 'tendency to identify the goods sold under the mark as

emanating from a particular, although possibly anonymous, source.'" *Akiro LLC v. House of

Cheatham, Inc.*, 946 F. Supp. 2d 324, 333 (S.D.N.Y. 2013) (quoting *The Sports Auth., Inc. v.

Prime Hosp. Corp.*, 89 F.3d 955, 960 (2d Cir. 1996)). In determining the strength of a mark,

"courts must consider two forms of distinctiveness: (1) inherent distinctiveness, and (2)

distinctiveness in the marketplace." *Limited v. Macy's Merch. Group Inc.*, No. 15-cv-3645, 2016

WL 4094913, at *6 (S.D.N.Y. Aug. 2, 2016) (citing *Streetwise Maps, Inc. v. VanDam, Inc.*, 159

F.3d 739, 743-44 (2d Cir. 1998)).

With respect to inherent distinctiveness, "[m]arks are classified, in ascending order of

strength, as (1) generic; (2) descriptive; (3) suggestive; [or] (4) arbitrary or fanciful." *Star

Indus.*, 412 F.3d at 384-85 (internal quotation mark and citation omitted). Generic marks, which

are "not protectable under any circumstances," consist of "words identifying the relevant

category of goods or services." *Id.* at 385. Descriptive words consist of "words identifying

qualities of the product." *Id.* While "not inherently distinctive," descriptive marks "are

protectable provided they have acquired secondary meaning." *Id.* Suggestive marks "are those

that are not directly descriptive, but do suggest a quality or qualities of the product, through the

use of imagination, thought and perception." *Id.* (citations and internal quotation marks omitted). Finally, "[a]rbitrary or fanciful marks are ones that do not communicate any information about the product either directly or by suggestion." *Id.* (citation omitted). Such marks "are the strongest." *Id.* (collecting cases). Additionally, "an incontestable registered trademark enjoys a conclusive presumption of distinctiveness." *Savin*, 391 F.3d at 457 (citations omitted).

To address distinctiveness in the marketplace, a court looks to factors "such as third-party use of similar marks, duration of use, and sales volume." *Nature's Best, Inc. v. Ultimate Nutrition, Inc.*, 323 F. Supp. 2d 429, 432 (E.D.N.Y. 2004) (citation omitted). "It is well settled that third party registration and use dilutes the strength of the mark." *Id.* (citation and internal quotation marks omitted).

Here, HYP is an incontestable registered trademark. Even if the Court held otherwise, it would still be a fairly strong mark. With respect to inherent distinctiveness, the name "HYP" is arbitrary and fanciful, as it "has no intrinsic relationship whatsoever to selling" socks. *Virgin Enter. Ltd. v. Nawab*, 335 F.3d 141, 149 (2d Cir. 2003).

The Court next addresses distinctiveness in the marketplace. Knowledge of the HYP trademark counts somewhat in favor of Plaintiff. While HYP is unlikely to be a "top-of-mind" brand for relevant consumers, SMF ¶¶ 94, 98, "every major retail company in America knows" HYP. *Id.* ¶ 96.

However, third-party use cuts against Plaintiff. Plaintiff has employed a trademark watch service, but that service is limited to applications filed with the PTO and some international government trademark offices. SMF ¶ 103. It does not include a search of "common law (i.e., non-registered) uses" or "domain names." *Id.* ¶¶ 104-05.

Defendants present evidence of thirteen companies that use a version of "Hype (Exs. 2-8, 11, 12) or "Hyp" (Exs. 9, 10, 13, 14) in apparel without Plaintiff's permission. SMF ¶¶ 99-100. While Plaintiff admits that it was unaware of all but one use, Levy notes that Hyp did send a cease and desist letter to that company. Deposition of Howard Levy ("Levy Dep") at 59:2-25 (ECF No. 72-3). Plaintiff further cites this litigation as an example of its trademark enforcement. Additionally, as Plaintiff notes, only four of the trademarks involved socks. Exs. 8 ("H for Hype"), 9 ("HYP Socks") (the company to whom Plaintiff sent a cease and desist letter), 10 ("Hypland"), 11 ("JustHype"). Finally, Defendants offer no evidence that any of these trademarks were actually well promoted or recognized by customers. These factors cut against Defendants. *See Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167, 1174 (2d Cir. 1976) (error to give significant weight to other trademarks using variations of Vera without "any evidence to support the claim that plaintiff's trademark was weakened by uses of similar marks by third parties," and when several third-party uses "were registered for entirely unrelated products" and used "combinations of words, rather than the word 'Vera' alone").

Accordingly, this factor counts in favor of Plaintiff.

### b. Degree of Similarity

"To apply this factor, courts must analyze the mark's overall impression on a consumer, considering the context in which the marks are displayed and 'the totality of factors that could cause confusion among prospective purchasers.'" *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005) (quoting *Gruner*, 991 F.2d at 1078); *accord Akiro*, 946 F. Supp. 2d at 334 ("Similarity is a holistic consideration that turns on the marks' sight, sound, and overall commercial impression under the totality of the circumstances."). "With respect to word marks, courts begin by examining their text, typeface, and general

appearance." *Mr. Water Heater Enter., Inc. v. 1-800-Hot Water Heater, LLC*, 648 F. Supp. 2d 576, 586 (S.D.N.Y. 2009) (internal quotation marks and citation omitted). In this analysis, "[e]ach mark must be compared in its entirety; juxtaposing fragments of each mark does not demonstrate whether the marks as a whole are confusingly similar." *Id.* (internal quotation marks and citation omitted). Since "[t]rademarks, like small children, are not only seen but heard," courts consider an audio, not just visual, comparison of the marks. *Akiro*, 946 F. Supp. 2d at 334 (quoting *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf.. v. Steinway & Sons*, 523 F.2d 1331, 1340 (2d Cir. 1975)).

However, "the typewritten and aural similarity of the marks . . . does not necessarily make the marks similar for purposes of assessing confusion under a *Polaroid* analysis." *Medici Classics Prods. LLC v. Medici Group LLC*, 590 F. Supp. 2d 548, 554 (S.D.N.Y. 2008) (collecting cases). Courts must also look to "how they are presented in the marketplace." *Id.* (citing *The Sports Auth.*, 89 F.3d at 962). In this analysis, "differences in typeface, font and general presentation may lead to a finding that two marks are substantially different in use." *Aztar Corp. v. NY Entertainment, LLC*, 15 F. Supp. 2d 252, 258 (E.D.N.Y. 1998) (citing *Grotian*, 523 F.2d at 1339). "Moreover, [s]ide by side comparison is not the appropriate test. Rather, the correct test is whether a consumer who is somewhat familiar with the plaintiff's mark would likely be confused when presented with defendant's mark alone." *Akiro*, 946 F. Supp. 2d at 334 (internal citation and quotation marks omitted).

Here, visual and aural similarity count somewhat in favor of Plaintiff. The trademarked text alone is similar: the HYPE mark adds only one letter to HYP. The fact that Defendants' mark contains an extra word, "socks," has little import, as "[w]hen the dominant words in two marks are the same, courts have found that their similarity can cause customer confusion." *Flat*

*Rate Movers, Ltd. v. FlatRate Moving & Storage, Inc.*, 104 F. Supp. 3d 371, 380 (S.D.N.Y. 2015) (internal quotation marks and citation omitted). Additionally, the HYP mark is "not limited to any logo, but to the word[] [itself]." *Aztar*, 15 F. Supp. 2d at 258 n.6. With respect to aural similarity, individuals pronounce HYP as either "h-i-p" or "h-y-p-e." SMF ¶ 2. Levy testified that he pronounces the mark "h-i-p" because "it was shortened from Hypnotic," Levy Dep at 13:2-5, but customers who lack that background pronounce the mark as "h-y-p-e." *Id.* at 13:4-7.

Presentation in the marketplace, however, cuts toward Defendants.

 

As shown above, the HYP mark generally appears surrounded by a swirl logo. While Levy claims that Plaintiff has "occasionally" used the trademark without the swirl, he could not provide any specific instances of such use. *Id.* at 36:15-25. The Court notes that representations of the trademark in evidence contain the swirl. *See* Gainor Decl Ex. 7 at 5-10; Declaration of Kaitlyn A. Haase ("Haase Decl") ¶ 7, 9-16 (ECF No. 72-2). Defendants, in contrast, use the HYPE logo with a bold triangle through the "H." *See* Gainor Decl Ex. 11.

As seen above, the parties also use different typefaces and coloring in the marketplace. This presentation "create[s] a vastly different impression on the viewer," making confusion

"unlikely." *Medici*, 590 F. Supp. 2d at 555. On the other hand, in emails the HYPE mark

typically appears in a generic typeface without the logo. *See* Gainor Decl, Exs. 4, 13.

Given these general differences in marketplace presentation, "the marks do not create the

same overall impression and their appearance in the marketplace is unlikely to confuse

consumers." *Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 491 (S.D.N.Y.

2004) (no similarity where Defendant's mark is "almost always accompanied by" a logo while

plaintiff's mark "lacks an accompanying picture" and "usually appears in a font that differs from

defendants' font"); *see also Denimafia, Inc. v. New Balance Athletic Shoe, Inc.*, No. 12-cv-4112,

2014 WL 814532, at *15 & n.65 (S.D.N.Y. Mar. 3, 2014) (collecting cases); *cf. Aztar*, 15 F.

Supp. 2d at 258 (Aztar used mark "in a variety of typefaces, fonts, and general presentations,

some of which vary only slightly from defendants' use" of the mark).

### c. Competitive Proximity

"To the extent goods (or trade names) serve the same purpose, fall within the same

general class, or are used together, the use of similar designations is more likely to cause

confusion." *Savin*, 391 F.3d at 458 (citation and internal quotation marks omitted). This factor

"has two elements, market proximity and geographic proximity." *Brennan's, Inc. v. Brennan's

Rest., L.L.C.*, 360 F.3d 125, 134 (2d Cir. 2004). With respect to market proximity, a court asks

"whether the two products are in related areas of commerce," while geographic proximity "looks

to the geographic separation of the products." *Id.* At bottom, "[b]oth elements seek to determine

whether the two products have an overlapping client base that creates a potential for confusion."

*Id.*

The Circuit has "made it clear that [its] concern with product proximity relates to the

likelihood that customers may be confused as to the *source* of the products, rather than as to the

products themselves." *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 396 (2d Cir. 1995) (internal quotation marks and citations omitted). Indeed, the issue is not whether a potential customer "would accidentally purchase" the other product, but rather whether "a purchaser could easily assume that, while the [products] themselves are different, they belong to the same genre of products and might well have the same source." *Id.* (internal quotation marks and citation omitted). Finally, this analysis proceeds "with reference to the first two *Polaroid* factors [strength of mark and similarity]." *Id.* (internal quotation marks and citation omitted).

Plaintiff contends that the parties sell the same type of product to the same customer base through the same channels of commerce. Defendants counter that they target a niche population of coaches and athletic programs while Plaintiff's products are available through major retailers nationwide.

### Type of Product

The fact that both companies sell the same type of product—athletic socks—counts somewhat in favor of market proximity. *See Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 421 (S.D.N.Y. 2012). However, the types of socks differ. Approximately 60-70% of Hyp socks bear licensed logos or characters such as DC Comics superheroes, Star Wars characters, or Nickelodeon characters. SMF ¶ 53. Defendants' socks, in contrast, are custom-designed for sports teams. *See id.* ¶ 74. Plaintiff counters that "sometimes a custom order would be done for somebody." Levy Dep at 87:2-6. However, making custom socks with a particular team logo is "[m]ost likely not" something the company would do. *Id.* at 78:23-25. Additionally, "the fact that both parties' products exist within the same industry is not enough" to satisfy competitive proximity. *Strange Music*, 326 F. Supp. 2d at 491 (collecting cases).

### Target Customers

The parties also target different aspects of the athletic sock market. Plaintiff primarily sells to a wide audience of individual consumers that make off-the-shelf purchases from retail stores. *See* SMF ¶¶ 50, 51. In contrast, Defendants' customer base is coaches who seek specialty designed socks for their sports teams. SMF ¶ 68. Defendants make these sales by directly reaching out to coaches through emails, texts, and phone calls, *id.* ¶¶ 69-72, as well as through their catalogs and website, *id.* ¶ 21.

Plaintiff contends that the parties' target customers are not totally distinct: Hyp also makes some socks for sports teams, and Hype sometimes sells to individuals that do not coach teams. For instance, Hyp has "made products for some college teams" including "possibly Georgetown" and "the Dallas Cowboys coach." Levy Dep at 21:14-18; *see also id.* at 86:4-9. However, such socks are "more on the giveaway side" such as in the "youth sports world." *Id.* at 86:17-23. Additionally, the graphics are not tailored to that team, instead containing "soccer balls or basketballs" or "Batman" or "Superman." *Id.* at 86:23-87:6.

Plaintiff also states that its promotional department has sold products to sports teams through catalogs. Supplemental Gainor Declaration ("Supp Gainor Decl") Ex. 28, Additional Deposition of Howard Levy ("Add'l Levy Dep") at 24:15-21, 26:22-25 (ECF No. 84-5). It contends that since coaches "go to a variety of sources, including these catalogs," to buy goods to "outfit [their] team," a coach targeted by Hype probably receives catalogs with Hyp's products "just like they're receiving solicitations from" Hype. *Id.* at 105:25-106:15. Yet importantly, Hyp's "socks are not included" in these promotional catalogs. *Id.* at 26:13-16.[5] Further, when asked what percentage of the company's sock business is for sports teams, Levy responded he

---

[5] Levy testified that Hyp gets "referrals for the sock business" through relationships formed through catalog distribution. Add'l Levy Dep at 24:21-23. However, Plaintiff provides no concrete information about such referrals.

was not sure but that "[t]he majority of [Plaintiff's] business is . . . retailers." Levy Dep at 22:7-12.

For their part, Defendants have made some sales to customers beyond sports coaches, including "a bachelor party," "a barber shop," a sales person's "family reunion," and Youtube star Logan Paul. Gainor Decl Ex. 5, Deposition of Wintermantel, Hype Socks & Hype Cheer ("Wintermantel Hype Socks & Cheer Dep") at 84:13-85:24 (ECF No. 76-5). Nevertheless, these are not Defendants' target customers. *See* SMF ¶ 27.

These differing customer bases count against proximity. *See Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 967 (2d Cir. 1981) ("[T]he record shows that Vitarroz targets its product at a distinct group of consumers, who shop for the Vitarroz name in specialty stores, many of which do not carry Borden's chips.").

### *Channels of Trade*

The parties generally distribute through different channels of trade. Plaintiff's products are primarily sold off-the-shelf directly to consumers through retail stores and e-commerce sites. SMF ¶¶ 51-52. Defendants, meanwhile, contend that customers cannot order their products through brick-and-mortar stores or the Internet. *Id.* ¶¶ 55, 57-59. Instead, customers must pick up the phone and speak to an account manager to "put in an order for 24 pairs or more" of Hype Socks, make an array of design choices, and wait at least two weeks to obtain their orders. *Id.* ¶¶ 60, 63, 66.

Plaintiff counters that Hype Socks' website allows individuals to place orders online. Supp Gainor Decl Ex. 29 (ECF No. 84-6). Indeed, screenshots of the site suggest that consumers can customize and "submit" their order online. *See id.* Defendants respond that people cannot actually complete their orders through that site alone. Instead, they must make

customizations through a sales person. SMF ¶ 75. The record is unclear on this point, but suggests that customers must additionally speak with a customer service representative to finalize their orders. *See* Gainor Decl Ex. 12 at 4 (HYPE catalog explains customers will "work closely with one of our experienced inside account executives" to design sock), 6-8 (catalog invites customers to "see some examples below and ask your representative for ideas").

Defendants admit that they have made some sales to the team department of a retail store. Wintermantel Hype Socks & Cheer Dep at 102:6-103:18. However, those sales were for the stores' "team sales department that sells to the coaches, not to sell to a retail . . . on the shelf." *Id.* at 102:14-18. The revenue from such sales, further, was "probably below a thousand dollars." *Id.* at 103:2-8.

Finally, Plaintiff states that the parties both sell socks on a private-label basis. However, the fact that both companies make private label sales does not increase customer confusion. Further, the record reveals that Plaintiff's private label socks do not always bear the HYP logo. Levy Dep at 19:3-21. This can count against confusion. *See Aerogroup Intern., Inc. v. Marlboro Footworks, Ltd.*, No. 96-cv-2717, 1996 WL 929597, at *13 (S.D.N.Y. Oct. 21, 1996) ("because Aerogroup does not place its Aerosoles trademark anywhere on the private label shoes, and because Aerogroup has presented no persuasive evidence that consumers can identify the waffle sole with a single label source, the private labeling in which Aerosoles has engaged does not alert the consumer to the fact that Aerosoles is involved in providing the product to the private label brand").

***Google Searches***

Plaintiff additionally argues that there is proximity because a Google search for "Hyp socks" turns up a result for "Hype Socks" in the first page of results. *See On Site Energy Co. v.*

*MTU Onsite Energy Corp.*, No. 10-cv-1671, 2012 WL 2952424, at *3 (E.D.N.Y. July 19, 2012). While such search results can cause "confusion . . . due to the ease with which the consumer could return to the search results posted by the search engine, courts in this district have held that so called internet initial confusion requires a showing of intentional deception on the part of the defendant before imposing liability." *Strange Music*, 326 F. Supp. 2d at 492 (citations omitted). Since Plaintiff has made "no assertion that defendants have intentionally crafted their website to create such confusion," this factor does not count in Plaintiff's favor. *Id.* Further, since Hype Socks' website requires potential customers to create a custom design, individuals searching for Plaintiff's off-the-shelves socks would not likely be confused.

### *Assessment*

The record establishes that the parties' products generally target different customers through different channels of commerce. This "means that shoppers who exclusively purchase in retail locations will not be at risk of encountering Defendants' products and being confused as to the source of the goods." *Juicy Couture, Inc. v. Bella Intern. Ltd.*, 930 F. Supp. 2d 489, 501 (S.D.N.Y. 2013); *accord New Look Party ltd. v. Louise Paris Ltd.*, No. 11-cv-6433, 2012 WL 251976, at *7 (S.D.N.Y. Jan. 11, 2012) ("[T]he fact that plaintiff does not sell its clothing in any physical locations in the United States—weighs heavily against a finding of likelihood of confusion."); *Strange Music*, 326 F. Supp. 2d at 491 (little likelihood of consumer confusion despite CDs bearing the same name because "Plaintiffs' CDs, unlike defendants' CDs, do not appear to be sold in traditional music store or outlets" or through "Amazon.com or other on-line stores" and instead are sold "'primarily' through [Plaintiff's] performances and websites"); *Denimafia*, 2014 WL 814532, at *17 ("Put simply, a consumer in the market for running shoes

or athletic apparel . . . would not even encounter Denimafia's products where New Balance's running shoes and athletic apparel are sold."). Thus, this factor cuts in favor of Defendants.

### d. Actual Confusion

"[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Savin*, 391 F.3d at 459 (citation and internal quotation marks omitted). Nevertheless, "[t]here can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion." *Id.* (citation and internal quotation marks omitted).

The Court bears in mind that "'trademark infringement protects only against mistaken purchasing decisions and not against confusion generally.'" *Strange Music*, 326 F. Supp. 2d at 494 (citing *Lang v. Ret. Living Pub. Co., Inc.*, 949 F.2d 526, 583 (2d Cir. 1991)). Accordingly, "[i]nquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion. Indeed, such inquiries are arguably premised upon a lack of confusion between the products such as to inspire the inquiry itself." *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 269 F.3d 114, 124 (2d Cir. 2001) (collecting cases).

First, Plaintiff submits two emails that it contends evince actual confusion. In February 2015, Levy's brother called Levy to inquire if Hyp sent an email he received from Hype Socks. SMF ¶¶ 10-11. Defendants contend that this anecdote is not credible since it comes from the brother of Plaintiff's CEO. Def Opp at 9-10. Then, on April 10, 2018, coach Steve DiGregorio, emailed Levy a solicitation he received from Hype Socks stating, "Hey Howie - I thought this was from you guys! Got confused for a minute! Thought you might be interested!" Supplemental Exhibit 1 (ECF No. 92-1). Defendants argue that this email is not credible since

DiGregorio and Levy are friends, noting the use of the informal "Howie" in the greeting and the fact that the individuals co-hosted a coaches event. Response to Supp Ex. 1 (ECF No. 95). Further, they contend that the email shows that DiGregoiro was not actually confused, since he figured out on his own that the email came from a different company.

Defendants have not shown evidence of bias so as to render the emails not credible here. However, the emails do not show actual confusion. Neither recipient accidentally purchased Hype products under the mistaken belief that they came from Hyp. The DiGregorio email even reveals that he only "got confused for a minute." Supp. Ex. 1. Such inquiries "do not amount to actual confusion." *Nora Beverages*, 269 F.3d at 124.

In any event, "[a] single anecdote[ ] of confusion over the entire course of competition . . . constitute[s] de minimis evidence insufficient to raise triable issues." *Savin*, 391 F.3d at 459 (citation and internal quotation marks omitted). Plaintiff has not adduced any other specific instances of confusion. *See* Levy Dep at 73:9-15. This counsels against actual confusion. *See Nora Beverages*, 269 F.3d at 124 ("two anecdotes of confusion over the entire course of competition constituted *de minimis* evidence insufficient to raise triable issues"); *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir. 1985) (two letters from magazine subscribers "insignificant when contrasted to the hundreds of thousands of magazines sold over the years").

Second, Plaintiff offers a consumer survey conducted by Dr. Melissa Pittaoulis ("Pittaoulis Report") (ECF No. 78-2). "A plaintiff can often show actual confusion by way of a well designed consumer survey." *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 495 (S.D.N.Y. 2015) (citation and internal quotation marks omitted). Defendants have moved to strike this expert report. For the reasons discussed *infra* Section II, the Court has

considered the Pittaoulis Report but afforded it limited weight due to significant methodology deficiencies.

The Pittaoulis Report revealed a net confusion rate between HYP and HYPE of 12.0%. Pittaoulis Report ¶ 46. Among coaches specifically, the net confusion rate was 21.6%. *Id.* ¶ 56. Dr. Pittaoulis concluded to a reasonable degree of professional certainty that these results indicate that coaches are likely to confuse the parties' marks. *Id.* Courts in this Circuit have found similar, and even lesser, net confusion rates as probative of actual confusion. *See Sunny Merch*, 97 F. Supp. 3d at 496 (collecting cases); *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 535-36 (S.D.N.Y. 2011) (collecting cases).

While this net confusion rate suggests some level of actual confusion, due to flaws in the survey methodology the Court affords it only limited weight.

### e. Bridging the Gap

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus.*, 412 F.3d at 387 (citation omitted). A plaintiff's intention to bridge the gap "'helps to establish a future likelihood of confusion as to source.'" *Educ. Testing Serv. v. Touchstone Applied Science Assoc's, Inc.*, 739 F. Supp. 847, 852 (S.D.N.Y. 1990) (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F. 2d 867, 874 (2d Cir. 1986)). Where the marks "appear on related products," this factor is "not of great relevance." *Sunny Merch.*, 97 F. Supp. 3d at 496; *accord Flat Rate Movers*, 104 F. Supp. 3d at 380 ("Because the two companies already operate in the same product and geographic markets, there is 'no gap to bridge,' and this factor is irrelevant."). "In order to bridge the gap, plaintiffs must demonstrate that they intend to enter the

market of defendants and that prospective customers are aware of this intention." *Strange Music*, 326 F. Supp. 2d at 493 (citing *Lang*, 949 F.2d at 582).

Here, Plaintiff argues that there is "no gap to bridge" because the parties already operate in the same market: sock sales. Even if a gap existed, Plaintiff argues, Hyp would bridge it. Plaintiff points to Wintermantel's testimony that he did not want to share Defendants' customer list because a company that had all of their customers "would be able to infiltrate the market that [they] are selling to." Wintermantel Hype Socks & Cheer Dep at 107:20-108:3.

Defendants respond that Plaintiff has not offered any evidence that it intends to sell customized socks to coaches. Moreover, Defendants contest that their desire to maintain propriety over their customer list indicates an acknowledgement that Plaintiff plans to enter their market.

The companies do not operate in the same market. As discussed above, Defendants sell customized socks to coaches while Plaintiff sells off-the-shelf socks in retail stores. Further, the record does not show that Plaintiff intends to bridge this gap. Defendants' desire to retain secrecy over their customer list is insufficient. Plaintiff has proffered no other evidence that it intends to target Defendants' customer base. *See Denimafia*, 2014 WL 814532, at *18 (hypothetical, unsubstantiated assertions of bridging the gap are insufficient) (collecting cases). Even if it had, Plaintiff certainly adduces no evidence that its customers *know* that it intends to bridge the gap. *See Strange Music*, 326 F. Supp. 2d at 493. This factor accordingly counts toward Defendants.[6]

---

[6] If the Court determined that the products were "in competitive proximity there is really no gap to bridge and this factor is 'neutral' in the *Polaroid* analysis." *Medici*, 590 F. Supp. 2d at 555 n.3 (citation omitted).

### f. Bad Faith

This factor "considers whether the defendant adopted its mark with the intention of capitalizing on [the] plaintiff's reputation and goodwill and [on] any confusion between his and the senior user's product." *Savin*, 391 F.3d at 460 (citation and internal quotation marks omitted). In this analysis, evidence that a defendant "has selected a mark which reflects the product's characteristics, has requested a trademark search or has relied on the advice of counsel" tends to show good faith. *The Sports Auth.*, 89 F.3d at 964 (citation and internal quotation marks omitted). Nevertheless, "'failure to perform an official trademark search, . . . does not[,] standing alone[,] prove that [Defendants] acted in bad faith.'" *Savin*, 391 F.3d at 460 (quoting *Streetwise Maps*, 159 F.3d at 746).

Additionally, "[p]rior knowledge of a senior user's mark" may still be consistent with good faith. *Id.* (quoting *Arrow Fastener*, 59 F.3d at 397). Furthermore, "a defendant's refusal to abandon a mark in the face of a cease and desist letter cannot demonstrate bad faith standing alone." *O'Keefe v. Oglivy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 525 (S.D.N.Y. 2008). This is because "[i]f a defendant reasonably believes its mark does not infringe plaintiff's, [it] does not act with the [requisite] intention of capitalizing on plaintiff's reputation and good will." *Id.* (internal quotation marks and citation omitted). Finally, courts may consider whether the defendant is a "habitual infringer" that has copied other brands. *Sunny Merch*, 97 F. Supp. 3d at 497.

First, Plaintiff argues that Defendants acted in bad faith by using the HYPE mark with knowledge of the HYP mark's existence. Defendants respond that they had never heard of HYP prior to the 2015 cease and desist letter. SMF ¶ 93. Further, Defendants emphasize that the

mark reflects the product's characteristics, stating they're going to "hype your team up." Wintermantel Hype Socks & Cheer Dep at 81:2-10.

Next, Plaintiff alleges that upon learning of the HYP mark through the cease and desist letter, Defendants expanded their use of the mark, incorporated as Hype Socks, LLC, and underwent a "full rebrand." SMF ¶¶ 16-20; *See* Gainor Decl. Ex. 10. Defendants respond that this was not an expansion, but a reorganization of the company that "had nothing to do with the case here at hand." Wintermantel Hype Socks & Cheer Dep at 56:8-57:10. Defendants contend that they created Hype Socks, LLC in August 2015 to give Anthony Garber a 5% ownership of the entity. Wintermantel Enter. Dep at 29:10-19. They did not alter their target customers, advertising, or any other aspect of their business. *Id.* at 29:20-30:17.

Finally, Plaintiff argues bad faith based on Defendants' habitual disregard for intellectual property laws. Plaintiff adduces evidence that Defendants have published copyrighted articles on their website without permission, used a trademark without permission in their catalog, and utilized various trademarks to promote products on their website without licenses. SMF ¶¶ 37-48. Defendants respond that they do not necessarily check to see if the marks are trademarked because there are often differences between the mark given to Hype Socks and the registered mark, and that these actions do not rise to the level of habitual disregard for intellectual property. Defendants' Response to SMF ("DRSMF") ¶ 44 (ECF No. 81-1); Gainor Decl Ex. 19, Deposition of Anthony Garber ("Garber Decl") at 125:20-126:7 (ECF No. 76-19). They also contend that Wintermantel did not authorize any blog posts and that any such posts have since been taken down. Wintermantel Hype Socks & Cheer Dep at 132:13-134:5.

Defendants have the better of the argument here. Plaintiff has not adduced evidence that Defendants acted in bad faith. Moreover, any evidence regarding potential infringement of other

marks does not rise to the level of habitual infringement so as to render it "unlikely that a jury could reach a conclusion other than [Defendant] intentionally misappropriated the [Plaintiff's] mark in bad faith." *Sunny Merch.*, 97 F. Supp. 3d at 497.

### g. Quality of Product

This factor "is the subject of some confusion." *Savin*, 391 F.3d at 460 (citation and internal quotation marks omitted). The Circuit has explained that "[e]ssentially, there are two issues with regard to quality, but only one has relevance to determining the likelihood of confusion." *Id.* 461. On the one hand, if the junior user's product is "low [quality] relative to the senior user's, then this increases the chance of actual injury where there is confusion." *Id.* Nevertheless, at the same time it "actually tends to reduce the likelihood of confusion in the first instance, because buyers will be less likely to assume that the senior user whose product is high-quality will have produced the lesser-quality products of the junior user." *Id.* On the contrary, "where the junior user's products are of approximately the same quality as the senior user's, there is a greater likelihood of confusion"—though, of course, "less possibility of dilution." *Id.*

Here, there is no evidence that Defendants' products are of inferior quality. This counts against damages, but in favor of confusion. Accordingly, this factor is "evenly balanced." *Star Indus.*, 412 F.3d at 389; *accord Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 389 (S.D.N.Y. 2008) ("[plaintiff] does not allege that [defendant]'s products are inferior, nor is there any evidence in the record substantiating the high or low quality of defendant's products relative to those of plaintiff. As a result, this factor is neutral as a matter of law.").

### h. Sophistication of Buyers

"As the theory goes, the more sophisticated the purchaser, the less likely he or she will be confused by the presence of similar marks in the marketplace." *Savin*, 391 F.3d at 461

(citation omitted). "Purchasers of higher cost goods or services are presumed to be more discriminating." *Flat Rate Movers*, 104 F. Supp. 3d at 381. This is because "'[i]f the goods are expensive, the reasonably prudent buyer does not buy casually, but only after careful consideration. Thus, confusion is less likely than where the goods are cheap and bought casually.'" *Malletier*, 561 F. Supp. 2d at 389 (quoting 4 McCarthy § 23:96).

Here, Plaintiff contends that the average consumer is not particularly sophisticated as socks are a low-cost item. Further, it argues that even if consumers were sophisticated, confusion still exists where, as here, the products are identical. Defendants respond that its detailed purchasing process requires discerning customers, and further the major retailers that purchase Plaintiff's socks are sophisticated professional purchasers.

The record does not reflect that the relevant customers "are of any particular sophistication level." *Flat Rate Movers*, 104 F. Supp. 3d at 381. Accordingly, "[t]his factor is neutral." *Id.*

### i. Balancing the Factors[7]

This Court has balanced the aforementioned factors in view of the record before it. The Court concludes that, while Plaintiff's mark is strong, it is not sufficiently similar to Defendants' mark, competitive proximity between the products is limited, it is unlikely that Plaintiff will "bridge the gap," there is little evidence of actual confusion, and there is no evidence of bad faith. The remaining factors are neutral. As such, Plaintiff has not shown that Defendants' use of

---

[7] The *Polaroid* factors are non-exhaustive and courts "may have to take still other variables into account." *Polaroid*, 287 F.2d at 495. Defendants accordingly urge this Court to also consider Plaintiff's failure to police its trademark. Courts indeed consider third-party uses, which "dilutes the strength of the trademark." *Essence Commc'ns,, Inc. v. Singh Indus., Inc.*, 703 F. Supp. 261, 266 (S.D.N.Y. 1988) (citations omitted). This Court has already considered this factor *supra* in its analysis of the strength of Plaintiff's mark. Accordingly, it will not double-count the factor here.

the HYPE SOCKS mark creates a likelihood of confusion among customers. Summary judgment for Defendants is appropriate.

### *Bras*

The Court next considers the likelihood of confusion as to bras. As an initial matter, Defendants contend that Hyp's trademark does not cover bras. The trademark includes "clothing namely hats, caps, gloves, mittens, scarves, socks, tee shirts, sweatshirts, sweatpants, shorts, polo shirts, [and] jackets." SMF ¶ 119. Plaintiff responds that "clothing" encompasses bras. For the purposes of this motion, the Court assumes without deciding that the trademark covers bras.

Next, Defendants contend that there can be no infringement because Plaintiff does not "use" the HYP mark in connection with bras. In order to be "used in commerce," the mark must be placed on the goods when they "are sold or transported in commerce." 15 U.S.C. § 1127. Thus, "mere advertising" is insufficient. *Lands' End, Inc. v. Manback*, 797 F. Supp. 511, 514, 24 U.S.P.Q.2d 1314 (E.D. VA. 1992) (citing *In re Shipley Co.*, 230 U.S.P.Q. 691, 694 (T.T.A.B. 1986)). "A crucial factor in the analysis is if the use of an alleged mark is at a point of sale location." *Id.* A catalog that allows a customer to "identify a listing and make a decision to purchase," for example, can constitute "use." *Id.*

Here, a Hyp catalog advertising sports bras contains the HYP mark. SMF ¶ 113; Haase Decl ¶ 2, 5-8. However, none of the bras pictured contain the mark. SMF ¶ 114. Moreover, the catalog does not appear to offer information for purchasing the bras. Accordingly, the catalog fails the *Lands' End* test. *Cf. Menashe v. V Secret Catalog, Inc.*, 409 F. Supp. 2d 412, 425 (S.D.N.Y. 2006) ("prominent use of the Mark in its catalogs . . . and on its website . . . together with pictures and descriptions of the goods meets the *Lands' End* test, as both mediums were 'point of sale' displays).

Plaintiff responds that the catalog does not represent "the universe of trademark usage in Hyp's bra business." Pl Opp at 22 n.15. Yet Plaintiff provides no other evidence of the HYP mark on its actual bras. Levy testified that "[his] company's trademarks *may* appear on *some* of [Hyp bra] *packages*." Add'l Levy Dep at 75:11-13 (emphasis added). However, while "[i]n recent years" Hyp's bras contained the HYP mark on "the actual product," not just the package, "[c]urrently today" the HYP mark does not appear on the bras themselves. *Id.* at 75:18-24.

Without "use" of the HYP mark on its bras, there can be no trademark infringement claim. In any event, this Court has already held that there is no likelihood of confusion between the HYPE and HYP marks. Thus, summary judgment for Defendants is appropriate.

### ii. Federal Unfair Competition and False Designation of Origin

Section 43(a) of the Lanham Act "prohibits any misrepresentation likely to cause confusion as to the source or the manufacturer of a product." *Lipton v. Nature Co.*, 71 F.3d 464, 473 (2d Cir. 1995). To state a claim, "a plaintiff must show it (1) has a valid trademark entitled to protection and (2) that the defendant's mark is likely to cause confusion in the marketplace." *N.Y. City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 3314 (S.D.N.Y. 2010) (citations omitted). Courts apply the *Polaroid* factors when assessing the latter prong. *Id.*; *see Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 410 & n.7 (S.D.N.Y. 2006) ("trademark infringement is a narrower form of unfair competition, and the same legal test applies with respect to both").

If "it is shown that a defendant deliberately engaged in a deceptive commercial practice," then "a powerful inference may be drawn that the defendant has succeeded in confusing the public." *Resource Dev., Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 140 (2d

Cir. 1991). If the plaintiff shows "such deliberate conduct, the burden shifts to the defendant to demonstrate the absence of consumer confusion." *Id.*

Here, since Plaintiff has not shown bad faith it "cannot avail itself of this burden-shifting doctrine." *Id.* Moreover, Plaintiff has not demonstrated a likelihood of confusion. Accordingly, Defendants are entitled to summary judgment on this claim.

### iii. Common Law Unfair Competition

"The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another." *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 208 (S.D.N.Y. 2008) (quoting *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980)). "[T]he plaintiff must show either actual confusion in an action for damages or a likelihood of confusion for equitable relief." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 35 (2d Cir. 1995) (citation omitted). "Additionally, there must be some showing of bad faith." *Id.* (citation omitted).

Here, because Plaintiff has not shown bad faith, actual confusion, or a likelihood of confusion, there can be no unfair competition claim. Accordingly, Defendants are entitled to summary judgment.

## II.     Admissibility of Expert Testimony

The Court now addresses Defendants' motion to exclude the Pittaoulis Report. The Pittaoulis Report relies on a "two-room *Squirt* survey." Pittaoulis Report ¶¶ 8, 9. In such surveys, respondents are exposed to the junior and senior marks and then asked a series of questions in order to ascertain whether they think the marks come from the same or affiliated companies. *Id.* ¶ 8. Through the "two-room" approach, the junior and senior marks do not appear together simultaneously. *Id.* ¶ 9.

The relevant population for the survey was the junior user's target market—here, "purchasers of athletic socks, namely coaches and others who would purchase team socks." *Id.* ¶ 15. Dr. Pittaoulis designed her survey questions with the "understanding" that Plaintiff and Defendants "offer their products 'through the same channels of trade which are directed to the same customers and/or prospective customers.'" *Id.* ¶ 8 (quoting FAC ¶ 22). Accordingly, respondents were told that they were viewing socks they "might see if [they] were shopping." *Id.* ¶ 19.

The survey was divided into three sections. In section one, respondents saw four brands of socks: HYP and "distractor" brands Bioworld, Stance, and Reebok. *Id.* ¶¶ 9, 20-21. In section two, respondents answered questions about their sports game attendance. *Id.* ¶¶ 9, 22-25. This "provide[d] temporal space before they would be exposed to the HYPE Socks brand." *Id.* ¶ 9.

Finally, in the third section respondents answered questions about an email and catalog for socks. *Id.* At this point, respondents were randomly assigned to either the "test" or "control" group. *Id.* ¶ 27. The test group respondents saw an email and catalog for HYPE Socks, while the control group respondents saw the same information for the artificial brand "HIVE" socks. *Id.* However, Dr. Pittaoulis was unable to replace all mentions of HYPE in the catalog with HIVE and accordingly removed some images of the relevant mark for the control group. *Id.* ¶ 27 n.19.

Respondents were then asked three questions to measure whether they believed that (1) the catalog socks were "made or put out by" any of the companies from section 1, *Id.* ¶ 29, (2) such socks were "associated or connected with any of the companies in section 1, *id.* ¶ 30, or (3)

the company that put out the catalog socks "received permission or approval from any of the companies" in section 1. *Id.* ¶ 31.

For each question, Respondents could answer "yes," "no" or "don't know," which appeared in randomized orders for each participant. *See id.* at Ex. F, 12-14. If respondents answered "yes," they were asked to identify the socks from section 1 that they believed were connected to the catalog socks. *Id.* ¶¶ 29-31. Then, they were asked to describe why they believe that connection exists, with as much specificity and detail as possible. *Id.*

## A. Standard of Review

Courts assess the admissibility of expert testimony under Federal Rule of Evidence 702, which provides in relevant part:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

*Sunny Merch.*, 97 F. Supp. 3d at 503 (citing Fed. R. Evid. 702). Under *Daubert*, which Rule 702 has codified, "a court is required to ensure that challenged expert testimony 'is not only relevant, but reliable.'" *Malletier*, 525 F. Supp. 2d at 579 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). Thus, "[t]he court's role is one of a gatekeeper to exclude invalid and unreliable expert testimony." *Bickerstaff v. Vassar College*, 196 F.3d 435, 449 (2d Cir. 1999) (citation and internal quotation marks omitted).[8] Courts have counseled that this inquiry "is a

---

[8] The Supreme Court has "made clear that the gatekeeping function applies not just to scientific expert testimony as discussed in *Daubert*, but also to testimony based on technical or other specialized knowledge." *Malletier*, 525 F. Supp. 2d at 579.

flexible one, and a liberal standard of admissibility ought to be employed." *Sunny Merch.*, 97 F.

Supp. 3d at 503 (internal citations and quotation marks omitted).

Courts assess the validity and reliability of expert surveys by considering a number of

criteria, including whether:

> (1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts.

*THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230-31 (S.D.N.Y. 2010) (citations omitted).

In this analysis, "[t]he closer the survey methods mirror the situation in which the

ordinary person would encounter the trademark, the greater the evidentiary weight of the survey

results." *Id.* (citation and internal quotation marks omitted). Additionally, "[t]he failure of a

survey to approximate actual marketplace conditions can provide grounds for inadmissibility."

*Id.* (citation omitted).

Flawed survey designs do not necessarily render the instrument inadmissible. Indeed,

"[c]ourts in this district have routinely admitted flawed survey evidence where the evidence does

not appear to be devoid of all probative value." *POM Wonderful LLC v. Organic Juice USA,*

*Inc.*, 769 F. Supp. 2d 188, 200 (S.D.N.Y. 2011) (citation omitted). So long as "there is sufficient

indicia of reliability . . . '[v]igorous cross examination, presentation of contrary evidence, and

careful instruction on the burden of proof are the traditional and appropriate means of attacking

shaky but admissible evidence.'" *Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 28

(E.D.N.Y. 2009) (quoting *Daubert*, 509 U.S. at 596). Nevertheless, "a survey should be

excluded under Rule 702 when it is invalid or unreliable, and/or under Rule 403 when it is likely

to be insufficiently probative, unfairly prejudicial, misleading, confusing, or a waste of time."
*THOIP*, 690 F. Supp. 2d at 231.

## B. Analysis[9]

### i. Appropriateness of Squirt Survey

Defendants contend that a Squirt survey was inappropriate here because the products are not in competitive proximity. According to Jerre B. Swann, an expert upon whom Plaintiff relies, Squirt surveys should be used where (1) "accessibility of the senior mark in memory is low to nonexistent" and (2) "the brands exist together in the market or one is typically encountered sufficiently soon after the other." Shari Seidman Diamond & Jerre B. Swann, *Trademark and Deceptive Advertising Surveys: Law, Science, and Design* 54, 67-68 (2012) (ECF No. 78-4). The second criterion is necessary because, if the products are not "directly competing or complementary goods/services with identical or substantially overlapping consumers," then "respondents who report a 'connection' due to the 'similarity of names' are 'demonstrating merely that they had read the names . . . in artificially close proximity.'" *Id.* at 54, 70 (quoting *Kargo Global, Inc. v. Adv. Magazine Pubs., Inc.*, No. 06-cv-550, 2007 WL 2258688, at *9 (S.D.N.Y. Aug. 6, 2007)).

However, courts define proximity in the modern marketplace broadly. A court must consider "products that, while infrequently seen side-by-side, are (i) complementary and/or (ii) purchased by substantially overlapping consumer groups--that is, that are seen by consumers in sufficiently tight timeframes, sufficiently often, so as to present realistic comparative opportunities." *Swann, Eveready and Squirt—Cognitively Updated*, 106 T.R. 727, 743-44

---

[9] The record reflects, and Defendants do not appear to contest, that Dr. Pittaoulis is a qualified expert and that a report would help the trier of fact determine a relevant issue, namely, whether there is actual confusion. Accordingly, the Court does not address these elements of the *Daubert* analysis.

(2016). For instance, "[f]or products that are frequently bought or researched on the Internet," the proximate appearance of both brands on Internet searches "may well satisfy the proximity proof environment, and stimuli in such instances should be selected to reflect the Internet environment." *Id.* at 744.

There is no dispute that the HYP mark is not "top of mind" and thus the first criterion is satisfied. *See* SMF ¶ 98. The question is whether the second criterion is met.

The record establishes that the parties generally do not target the same customers or use overlapping channels of trade. Consumers will not encounter Hype socks in a retail store. Nor can they custom-order Hyp socks online. Plaintiff contends that similar Google search results for Hyp and Hype establish marketplace proximity. This is insufficient. First, Plaintiff did not establish that both products "are frequently bought or researched on the Internet." *Eveready and Squirt*, 106 T.R. at 743. Indeed, Defendants contend that their socks cannot be purchased through a website. SMF ¶ 59. Moreover, there is no evidence that customers would research Plaintiff's socks online. Second, even if there was Internet proximity, the survey would need to "be selected to reflect the Internet environment." *Eveready and Squirt*, 106 T.R. at 744. Here, however, the survey addressed appearance in catalogs. Pittaoulis Report ¶ 9.

To be sure, the products do not operate in wholly separate markets. They are both athletic socks. Presumably, for instance, some coaches who custom-order Hype socks for their team would also visit retail stores that carry Hyp socks. Yet considering all of the evidence, the Court concludes that Pittaoulis Report addressed an artificial marketplace as "in the real world," the HYP and HYPE marks are not "frequently encountered in physical or temporal proximity."

*Eveready and Squirt*, 106 T.R. at 742 (emphasis added). Thus, a Squirt survey was inappropriate.[10]

Assuming that the products operate in marketplace proximity, however, the Court proceeds to analyze the rest of the survey.

### ii. Leading Questions

Defendants contend that the survey posed overly-suggestive questions. For instance, Dr. Pittaoulis frequently presented only the affirmative position, such as "Do you think these socks . . . and any of the socks you saw in the first section of the survey are made or put out by the same company?" Pittaoulis Report ¶ 29. Defendants argue that a proper question would add the negative, inquiring, "Do you think these socks . . . are from a separate company, or do you think any of the socks you saw in the first section of the survey are made or put out by the same company as the socks in the catalog?" or even "Do you think these socks . . . and any of the socks you saw in the first section of the survey are made or put out by the same company or not?" Def Expert Mem at 7 & n.7.

Plaintiff responds that the survey questions were standard, and that Dr. Pittaoulis properly chose not to add phrasing such as "or not" because it would have made the question "cumbersome." Pl Expert Mem at 23; Pittaoulis Dep at 59:22-60:9, 110:3-10. However, the authority on which Dr. Pittaoulis relied supports including the negative phrasing to avoid leading questions, even though it "is admittedly a mouthful and not the sort of question we would ask

---

[10] The Court notes that an Eveready survey would also be inappropriate because Hyp is not "top of mind." *See* SMF ¶ 98; *Trademark and Deceptive Advertising Surveys* at 64. HYP thus appears to be one of the marks that does not lend itself to either survey instrument. This is "not troublesome" since "if a senior mark is neither stored in memory nor proximate to a junior use, there is little possibility that it can be compared to the junior use sufficiently to generate a likelihood of consumer confusion, and survey evidence cannot ignore that reality." *Eveready and Squirt*, 106 T.R. at 728. Accordingly, the inapplicability of both survey instruments counts against actual confusion.

someone under normal circumstances." Def Expert Mem at 10 (citing "Are Closed-Ended Questions Leading Questions?" at 275 *in Trademark and Deceptive Advertising Surveys*).

Plaintiff attempts to differentiate the questions Dr. Pittaoulis posed from those deemed unduly suggestive because she did not ask respondents to solely compare Hyp and Hype. Instead, she also included distractor brands. However, as discussed below those distractor brands were improper.

Finally, Plaintiff notes that Dr. Pittaoulis properly included "don't know" as an answer. Pl Expert Mem at 22; *see* Swann, *Likelihood of Confusion Studies and the Straitened Scope of Squirt*, 98 T.R. 739, 742 n.16 (2008). She additionally rotated answers and told respondents not to guess. Pl Expert Mem at 23; *see* Pittaoulis Report ¶ 22. Defendants question the value of adding "don't know." *See* Def Reply at 8.

The Court determines that any issues regarding the phrasing of these questions "are factored into the weight to be given to the evidence," not to its admissibility. *Cache, Inc. v. M.Z. Berger & Co.*, No. 99-cv-12320, 2001 WL 38283, at *11 (S.D.N.Y. Jan. 16, 2001).

### iii. Miscounting Responses

Defendants next argue that the survey improperly counted responses to open-ended questions as indicating confusion. They contend that 68 out of 200 answers reveal that respondents connected HYP and HYPE based on reasons unrelated to the similarity of the marks. For example, numerous answers related to the similarity of the socks, not of their source. *See* Pittaoulis Report Ex. H (Respondent ID 214: "Type that might be worn for sports"; Respondent ID 424: "They look like they have the same quality"; Respondent ID 1130: "THE STYLE"). Still other answers were incomprehensible or unresponsive, such as "a great deal" (Respondent

ID 355), "superman" (Respondent ID 1467), and "one company makes smart sense" (Respondent ID 2478). *Id.*

Plaintiff asserts that these open-ended questions constituted a "qualitative check," not a "control." Pl Expert Mem at 24. According to Dr. Pittaoulis, these answers "are not relied upon in the confusion analysis" since "different respondents have different abilities to be articulate about why they made connections." Pittaoulis Dep at 95:17-24. She explained that "[t]he control nets out all of the answers where people made a connection for reasons like the style of the shoe or the style of the product." *Id.* at 95:25-96:4.

However, whether the survey also included separate controls is not the issue. As Defendants identify, the relevant issue is whether Plaintiff improperly counted as positive identifications of confusion answers that were "unrelated to likelihood of confusion or similarity of branding." Def Reply at 9.

Dr. Pittaoulis "removed and replaced any respondents who [Pittaoulis] identified as providing nonsensical or gibberish answers to the open-ended questions." Pittaoulis Report ¶ 34. It is unclear whether the aforementioned responses include those that were "removed or replaced" as gibberish. The record suggests that, while open-ended answers were "not the basis" for Dr. Pittaoulis' opinion, they were not excluded. *See* Pitttaoulis Dep at 96:10-13. To the extent that the Pittaoulis Report counts answers that are nonresponsive or highlight the socks' similarity rather than the trademarks' similarity, the results are less credible. However, this goes to weight of the evidence, not its admissibility.

### iv. Improper "Distractors"

Defendants challenge the choices for the "distractor" brands in the survey. Dr. Pittaoulis stated that she "included Bioworld because the socks included licensed superhero characters,

similar to the HYP socks shown in the survey, one of which included the Superman logo."
Pittaoulis Report ¶ 45. She "included Stance because, like HYPE Socks, the socks included
team names." *Id.* Finally, she "included Reebok because the style of socks appeared similar to
the HYPE Socks shown in the catalog." *Id.* She did not recall "coming across any other team
socks that started with an H." Pittaoulis Dep at 29:8-10. Defendants charge that those brands
are ineffective as they "look and sound nothing like HYPE." Def Expert Mem at 15. They
contend that that Dr. Pittaoulis should have created fictitious brands, as she did with "HIVE" in
the control survey. *Id.*

Additionally, Defendants note that the net confusion rate with REEBOK (7.9%) was
nearly as high as that for HYP (12%). Def Expert Mem at 14-15. Plaintiff simply responds that
"Dr. Pittaoulis's determination is driven by analysis and data." Pl Expert Opp at 25.

The Court agrees that the "distractor" names are markedly different from Hyp, which
could lead to artificially high rates of association. Further, the relatively high confusion rate with
Reebok counts against the survey's reliability. However, these questions again go to weight, not
admissibility.

### v. Control Group

Defendants raise two issues with the control group. First, Defendants note that the test
group (exposed to HYPE) and the control group (exposed to the fictional brand "HIVE") were
not equally exposed to the respective marks. Indeed, the HYPE catalog showed the HYPE brand
name thirteen more times than the fictional HIVE catalog. Pittaoulis Dep. at 43:22-46:1.
Determining that it was "not material," Dr. Pittaoulis did not account for this differential
exposure in her analysis.

Second, Defendants cite the high rate of "noise"— control group confusion due to guessing or survey suggestively. Swann has expressed concern with control group "noise" levels above 25%. Swann, *Likelihood of Confusion* at 71. Here, the control group "noise" was 38%. Pittaoulis Report ¶ 9. However, the Court notes that Dr. Pittaoulis filtered out the control group when determining the net confusion rate. *See id.*

The survey contains numerous methodological errors. However, the Court cannot say that it is "so flawed in methodology that its probative value is substantially outweighed by its prejudicial effect" such that it is "devoid of all probative value on the issue of the likelihood of confusion." *Cache*, 2001 WL 38283, at *10-11. Accordingly, the Court has considered the survey as some evidence of actual confusion while factoring in its methodological flaws.

### III. Sealing

Finally, the Court addresses the parties' motions to seal briefing in this matter. The Court has reviewed Plaintiff's renewed motion to seal, which includes Defendants' position with respect to its customer list. For the reasons articulated in the Court's Order of April 20, 2018 (ECF No. 94), the parties' motions to seal portions of their summary judgment memoranda and Statement of Material Facts are DENIED.

Plaintiff's exhibits 25-27, which contain Defendants' customer lists and other identifying information for its customers, present a closer call. Such documents "fall[] into categories commonly sealed[:] those containing trade secrets, confidential research and development information, marketing plans, revenue information, pricing information, and the like." *Saint-Jean v. Emigrant Mortgage Co.*, No. 11-cv-2122, 2016 WL 11430775, at *4 (E.D.N.Y. May 24, 2016) (internal quotation marks and citation omitted). Under this reasoning, courts have sealed customer lists containing identifying information of non-parties due to the "significant privacy

interests" at stake. *Id.*; *accord Bijan Designer for Men, Inc. v. Katzman*, No. 96-cv-7345, 1997 WL 51504, at *2 (S.D.N.Y. Feb. 7, 1997). Accordingly, Defendants' customer list shall remain under seal. The columns of Exhibits 25 and 26 containing customer names shall be redacted. The rest of these exhibits shall be filed publicly. Exhibit 27 cannot be practicably redacted and thus may remain under seal. Plaintiff shall file the redacted versions of Exhibits 25 and 26 by October 5, 2018.

**SO ORDERED.**

Dated: September 28, 2018
      New York, New York

                              **ANDREW L. CARTER, JR.**
                              **United States District Judge**